**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANDREA GARCIA

Plaintiff,

v. Civ. No. 24-1067 SCY/DLM

THE REGENTS OF THE UNIVERSITY OF
NEW MEXICO,

Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Andrea Garcia alleges that Defendant University of New Mexico Hospital ("UNMH") interfered with and retaliated against her for exercising her rights under the Family and Medical Leave Act ("FMLA"). Garcia worked as a mental health professional at the Metropolitan Detention Center ("MDC") starting June 2021. During that time, Bernalillo County cycled through numerous contractors to provide medical services to MDC. Most recently, in 2023, Bernalillo County terminated its contract with YesCare and contracted with UNMH. Not long before UNMH took over, Garcia had been on continuous FMLA leave to care for her elderly parents and had requested intermittent FMLA leave going forward. She alleges that, after UNMH took over, she repeatedly asserted her right to take FMLA leave but UNMH refused to honor her requests for FMLA leave because, UNMH claimed, she had not worked for UNMH long enough to be eligible for such leave. In the present motion for summary judgment, Garcia argues that UNMH is a successor in interest to YesCare (such that her time with YesCare counts toward FMLA eligibility). Doc. 55; *see also* Doc. 61 (response); Doc. 64 (reply). The Court agrees that UNMH is a successor in interest of YesCare. Consequently, the Court grants Plaintiff Garcia's motion for partial summary judgment.

## UNDISPUTED MATERIAL FACTS

Except where otherwise noted, the following facts are undisputed. Bernalillo County operates MDC, which has an inmate population of around 1,550. Doc. 55-1 at 13, 26. Bernalillo County has been subject to a settlement agreement regarding its operation of MDC since at least 2016, stemming from the litigation in *McClendon v. City of Albuquerque*, Civ. No. 95-24-SMD-SCY (D.N.M.). *Id*. at 13. The purpose of the *McClendon* litigation settlement agreement was to resolve numerous inmates' federal civil rights complaints. *Id.* at 5. Relevant here, the *McClendon* litigation settlement agreement "sets forth eight (8) domains with which the County must substantially comply for the Court to vacate the County's obligations, on a domain-by-domain basis, under the [] Settlement Agreement." *Id.* at 14; *see also* Doc. 61-1 at 3. Two of the domains the *McClendon* settlement agreement addresses are the provision of medical care and mental health services to the inmate population. Doc. 55-1 at 14; Doc. 61-1 at 3.

Prior to 2023, Bernalillo County outsourced the provision of medical care and mental health services for the inmate population at MDC to private, for-profit correctional medicine providers. Doc. 55-1 at 5. In the five years before 2023, Bernalillo County contracted with three different correctional medicine providers, the latest of which was YesCare. *Id*.; Doc. 55-2 at 73. Bernalillo County ultimately terminated its contract with YesCare, effective July 25, 2023. Doc. 55-1 at 5.

On April 25, 2023, Bernalillo County entered into a joint powers agreement ("JPA") with UNMH, establishing the Metropolitan Detention Center Health Care Authority ("HCA"). Doc. 55-1 at 13, 15, 23. The JPA granted the HCA the power to provide and manage the provision of medical care and mental health services to the inmate population at MDC. *Id.* at 15. Under the terms of the JPA, the HCA is governed by a board of governors, with Bernalillo County and

UNMH each receiving three designated board members. *Id.* at 16. Through the HCA, Bernalillo County and UNMH expressed the belief that, as co-partners, they would be "able to better manage the continuum of care for inmates" at MDC. *Id*. at 7.

The HCA subsequently entered into a professional services agreement ("PSA") with UNMH on July 14, 2023, under which UNMH agreed to provide medical, dental, mental health, and psychiatric services to inmates in custody at MDC. Doc. 55-1 at 25. Under the terms of the PSA, the HCA and Bernalillo County agreed to provide security, ensure the maintenance of the premises, and ensure internet connectivity at MDC. *Id.* at 26. UNMH was responsible for providing additional health care equipment or instruments as it deemed necessary. *Id.* at 47. Such equipment would revert to the ownership of Bernalillo County upon termination of the PSA, unless Bernalillo County failed to reimburse UNMH for such equipment. *Id*. Additionally, UNMH medical personnel working at MDC were to be provided with IT equipment such as desktop and laptop computers. *Id*. According to UNMH Executive Director Rodney McNease, UNMH retained most of the IT equipment YesCare used at MDC but only some of the medical equipment. *Id*. at 96-98. McNease explained that UNMH had to replace some of the medical equipment at MDC "because a lot of it was obsolete when [UNMH] took over." *Id*. at 98.

As for a staffing model under the PSA, UNMH agreed to "develop a staffing pattern that meets the minimum staffing requirements outlined in the document and meet regulatory and compliance requirements to include, but not limited to: ACA, NCCHC, and Bernalillo County's obligations under the McClendon Settlement Agreement as it may be modified from time to time." Doc. 55-1 at 47. While claiming that the staffing model contemplated under the PSA was not a verbatim copy of the previous staffing model used by YesCare, McNease admitted in his deposition that the staffing model "was generally based on the prior staffing model." *Id.* at 69.

McNease, who was involved in drafting the PSA, also admitted that he used Bernalillo County's contract with YesCare as a model for drafting the PSA. *Id.* at 71. However, McNease testified that the PSA "was modified significantly to reflect more of a partnership relationship through the [HCA]." *Id*.

On July 26, 2023, UNMH began providing medical, dental, mental health, and psychiatric services to the inmate population of MDC. Doc. 55-1 at 25, 69. Due to the "challenge of getting people at" MDC, UNMH wanted to retain as many former YesCare employees as possible. *Id*. at 78. According to McNease, UNMH "tried to make clear that we were interested in maintaining staff from YesCare and that we would welcome them joining UNMH." *Id*. To that end, Jason Jones, a warden at MDC, sent a letter to YesCare employees on February 23, 2023, conveying that "UNMH wants to retain and recruit current medical staff, this includes all positions."[1] *Id.* at 126. When UNMH began operations at MDC on July 26, 2023, it had 68 employees on site, all of whom were former YesCare employees.[2] *Id.* at 92-93; Doc. 55-2 at 44-46. Despite retaining 68 YesCare employees, UNMH also held outside recruiting events to meet its staffing needs at MDC. Docs. 55-2 at 8; 61-3 at 5.

Among the former YesCare employees retained by UNMH were several individuals who held management positions. Doc. 55-2 at 44-46. For example, UNMH retained Lance Hurt, Ph.D., to be the Interim Behavioral Health Director at MDC. *Id*. at 49. However, on June 30, 2023, nearly a month before UNMH began operations at MDC, Hurt resigned. *Id*. Mila

---

[1] At that time YesCare had approximately 115 employees at MDC. Doc. 55-1 at 159-61.

[2] In his deposition, McNease testified that UNMH transferred leave balances that the former YesCare employees had accrued while working for YesCare. Doc. 55-1 at 87. As he put it, "the goal was to basically whatever amount of leave an employee had with YesCare that we—they would start with that amount of leave at UNMH so they wouldn't lose their leave." *Id*.

Mansaram, another former YesCare employee, then filled this position. *Id.* at 45; Doc. 55-1 at 62. UNMH also retained Michelle Bouyer, who served as the Health Services Administrator at MDC. Doc. 55-2 at 53. According to McNease, the Health Services Administrator was the top operational director at MDC. Doc. 61-1 at 2. Bouyer left this position after five or six months. *Id.* Additionally, UNMH retained Brian Dietch, who had previously served as the supervisor of the "advanced practice providers at MDC" with YesCare. Doc. 55-1 at 76.

Among the former YesCare employees UNMH retained was also Garcia. Doc. 55-2 at 81, 137. Prior to her employment with UNMH, Garcia worked as a mental health professional at MDC for several different correctional medicine providers. *Id.* at 65, 69-72. On June 27, 2023, UNMH offered Garcia a position as a full-time mental health counselor. *Id.* at 137. The position was virtually identical to the one Garcia previously held with YesCare. *Id.* at 82. Garcia accepted the offer, and her employment officially began with UNMH on July 26, 2023.[3] Doc. 55-2 at 137.

On June 12, 2023, prior to her employment with UNMH, Garcia requested continuous FMLA leave through Sedgwick, YesCare's third-party benefits administrator. Doc. 55-2 at 97. Garcia's request was approved, and she was granted continuous FMLA leave from June 23, 2023 to August 4, 2023.[4] *Id.* at 93. On July 20, 2023, Nick Bodnar, a UNMH human resources employee, emailed Garcia informing her that she was ineligible for FMLA leave through UNMH. Doc. 55-2 at 103. In response to Bodnar's email, Garcia wrote:

---

[3] Garcia had previously worked for UNMH as a mental health counselor from 2020 to 2021, when she resigned in lieu of termination in January 2021. Doc. 55-2 at 65.

[4] A document attached to Garcia's motion also shows that, on August 4, 2023, Sedgwick approved additional intermittent FMLA leave for a period from July 12, 2023 to January 11, 2024. Doc. 55-2 at 99. UNMH does not dispute that Sedgwick approved Garcia for intermittent FMLA leave. Doc. 61 at 7. However, it should be noted that Sedgwick, who acted as YesCare's third-party benefits administrator, approved Garcia's request for intermittent FMLA leave *after* YesCare's contract was terminated and UNMH assumed operations at MDC.

> My parents 85 and 95 years old got into a car accident and my mom needed spinal surgery. She is in a neck brace and can't do much—she used to care for my dad who also can't do much. They live four houses down from me so I have been caring for both of them. I am on FMLA leave with YesCare so that just stops? If so… I don't know what I'm going to do.

*Id*. Ryan Randall, another UNMH human resources employee, spoke with Bodnar prior to him responding to Garcia's email inquiring about intermittent FMLA leave. *Id.* at 113. In explaining why he did not believe Garcia was eligible for FMLA leave with UNMH, Randall testified:

> I mean, it wasn't really relevant what she may or may not have received from YesCare. That was a separate employer. That employment was ending. This was going to be a new employment. And so it didn't—she didn't meet basic eligibility requirements. So it wasn't relevant to us at that point in time to know what she may or may not have received from YesCare.

*Id.* at 114. Randall also disclosed in his deposition that, prior to Garcia raising the issue, UNMH had not considered whether it would honor FMLA leave approvals granted by YesCare prior to the transition. *Id*. at 112–13. Randall testified that he did not "recall there ever being any conversation about it, and it hadn't come up as a question until Ms. Garcia's questions raised the issue." *Id*. at 113.

## LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotations and brackets omitted). Only

material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (citation omitted). But when the movant would bear the burden of proof at trial, its initial summary judgment burden is "intensified," and it must establish all of the essential elements of its claim or defense as a matter of law. *Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015). If the movant meets its initial summary judgment burden, "the burden then shifts to the nonmovant," *Tesone*, 942 F.3d at 994, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant . . . by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotations and internal citations omitted).

## DISCUSSION

In Garcia's motion, she argues that UNMH is a successor in interest to YesCare for purposes of liability under the FMLA. Doc. 55 at 1. An employee is only eligible for FMLA leave if they have worked for a covered employer for at least twelve months and worked at least 1,250 hours for the employer during the previous twelve-month period. 29 U.S.C. § 2611(2)(A)(i)–(ii). "Work for a covered employer includes work performed for both a covered employer from whom leave is requested and any previous employer to whom the current covered employer is a 'successor in interest.'" *Cobb v. Cont. Transp., Inc.*, 452 F.3d 543, 551 (6th Cir. 2006) (quoting 29 U.S.C. § 2611(4)(A)(ii)(ll)). The successor in interest doctrine in the FMLA context is much broader than its corporate law counterpart. *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 781 (9th Cir. 2010). Unlike in corporate law, a transfer of assets or a merger/acquisition are not preconditions for imposing successor in interest liability in the FMLA context. *Cobb*, 452 F.3d at 554. Instead, "[t]he regulations implementing the FMLA instruct courts to consider the factors used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Adjustment Act in determining whether a covered employer is a successor in interest to a previous employer." *Id.* (quotations omitted). The relevant factors outlined in the FMLA regulations are:[5]

[5] In her motion, Garcia contends that the United States Department of Labor's ("USDOL") implementing regulations for the FMLA remain valid and persuasive even after the United States Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). In *Loper*, the Supreme Court overruled its prior decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." 603 U.S. at 412. Consequently, the *Chevron* demand that "courts mechanically afford *binding* deference to agency interpretations" of ambiguities in statutes that they administer was explicitly jettisoned by the Supreme Court in *Loper*. *Id.* at 372 (emphasis in original). However, as one federal district court has noted, although "courts are no longer permitted to defer to an agency's interpretation of a statute simply because the statute is

(1) Substantial continuity of the same business operations;
(2) Use of the same plant;
(3) Continuity of the work force;
(4) Similarity of jobs and working conditions;
(5) Similarity of supervisory personnel;
(6) Similarity in machinery, equipment, and production methods;
(7) Similarity of products or services;
(8) The ability of the predecessor to provide relief.

29 C.F.R. § 825(A)(1)-(8). These factors mirror factors that federal courts have developed in labor law and Title VII cases. *See Sullivan*, 623 F.3d at 781 (noting that the successor in interest doctrine "has arisen in many contexts and has a long history in case law."). "[T]he general thrust of the inquiry is whether the new business is essentially the same as the old business." *Id.* (quotations omitted).

When analyzing the issue of successor in interest liability, courts must also apply principles of equity. *See Cobb*, 452 F.3d at 554. Accordingly, courts consider whether "it would be equitable to impose such liability considering 1) the defendant's interest, 2) the plaintiff's interest, and 3) federal policy embodied in the relevant statute[] in light of the particular facts of the case and the particular duty at issue." *Id.* at 552. Finally, "courts must examine the successorship question from the viewpoint of the employee: In conducting the analysis, the court keeps in mind the question whether those employees who have been retained will understandably

---

ambiguous," an agency's "interpretation of a statute within its purview still amounts to valuable persuasive authority." *Wilson v. Whole Food Mkt.,Inc.*, No. 1:25-CV-00085-DAE, 2026 WL 196517, at *8 (W.D. Tex. Jan. 20, 2026). As even *Loper* recognized, "[c]ourts exercising independent judgment in determining the meaning of statutory provisions, consistent with the APA, may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." 603 U.S. at 371. In response to Garcia's motion, UNMH "agrees the regulatory factors are persuasive, but not in their own right, and they are not the only factors the Court should consider." Doc. 61 at 13. The Court will consider for their persuasive value the USDOL regulatory factors for determining whether UNMH is a successor in interest while also recognizing that the regulatory factors do not provide the ultimate test for successor in interest liability.

view their job situations as essentially unaltered." *Sullivan*, 623 F.3d at 782 (quotations and brackets omitted). To that end, the FMLA is a remedial statute, and its provisions "should be construed broadly to extend coverage." *Cobb*, 452 F.3d at 559.

In her motion, Garcia contends that each of the relevant factors "weigh in favor of UNMH being a successor in interest to YesCare under the FMLA." *Id.* at 14. She adds further that the "undisputed facts establish that UNMH stepped into YesCare's shoes in every meaningful way: same location, same services, same workforce, same equipment, same working conditions." *Id*. at 17. In contrast, UNMH asserts that the factors weigh in favor of finding that it is not a successor in interest to YesCare. Doc. 61 at 2. In support of this argument, UNMH contends that Garcia ignores material differences between it and YesCare in their involvement with the provision of medical care and mental health services to the inmate population at MDC. *Id.* at 1. UNMH asserts that, in the end, "the balance of equities and conflicting policy interests at issue in this lawsuit favor" finding that it is not a successor in interest. *Id.* at 24. The Court will address the factors and balance of equities in turn.

**1. Substantial Continuity of the Same Business Operations**

UNMH admits that "it is true to say that [it] provides a host of healthcare services at MDC, as did YesCare." Doc. 61 at 17. However, UNMH argues that it has "a much greater interest in the operations of the MDC than YesCare, which the Court should consider as part of its equitable analysis." *Id*. For example, UNMH contends that the goal of its partnership with the HCA "was to allow the county and UNM[H] to manage, as partners, the health care services provided to detainees at MDC." *Id*. To this end, UNMH notes that the JPA it entered into with Bernalillo County grants it authority "over the design and implementation of the healthcare services provided at MDC, authority to formulate policy, and power to take all other actions

necessary in furtherance of its authority." *Id*. at 18. Accordingly, UNMH contends that it has not "merely stepped into YesCare's shoes; rather, it has management and decision-making authority in the provision of medical and mental health services at MDC, as well as other operational obligations, that YesCare never had." *Id*.

The Court is unpersuaded by this argument. "In most cases in which courts have found substantial continuity, the new employer simply assumed a contract over a particular business function with few, if any, changes to the operation of the business." *Sullivan*, 623 F.3d at 784. This is precisely the situation the Court confronts in this case. UNMH indisputably contracted with the HCA to provide medical care and mental health services to the inmate population at MDC, services that YesCare had previously provided. True, the arrangement UNMH had with the HCA was different than the one YesCare had with Bernalillo County, as UNMH contracted with the HCA, not Bernalillo County, and the HCA did not exist at the time YesCare contracted to provide services to the inmates at MDC. Additionally, it is undisputed that UNMH appears to have had greater control over the design and implementation of medical care and mental health services at MDC than YesCare. However, UNMH has not provided any evidence demonstrating that such differences materially changed the core business operation of providing medical care and mental health services to the inmate population at MDC. In other words, despite differences in the contract UNMH had with the HCA, "the business operation was undisturbed." *Vanderhoof v. Life Extension Inst.*, 988 F.Supp. 507, 513 (D.N.J. 1997).

In contrast, Garcia has presented evidence that the essential business operation—providing medical care and mental health services to the inmate population at MDC—essentially remained the same after UNMH began providing such services at MDC. In her deposition,

concerning the transitions that have been made between contractors at MDC, Garcia testified that:

> They're all the same. I mean, they just—At midnight when the contract expires, those people—like the IT people come in, because they all have different electronic medical records, but they just put them on the computer. But everything else is exactly the same. And mostly, you know, like even the paperwork, as far as—If we would have to refer someone, even with UNM, we were using YesCare paperwork until they got their paperwork in.

Doc. 55-2 at 73-74.

Additionally, it is undisputed that there was not an interruption in providing medical care and mental health services to the inmates at MDC when YesCare's contract expired on July 26, 2023. This weighs strongly in favor of finding substantial continuity of business operations. *See Sullivan*, 623 F.3d at 784 ("Additionally, in most cases in which continuity is found, there is no break in operations: The employees continue working on day one of new employment just as they had on the last day of their former employment.").

Accordingly, the evidence presented demonstrates that this factor weighs in favor of finding that UNMH is a successor in interest to YesCare.

**2. Use of the Same Plant**

The term "plant," as used in the FMLA's implementing regulations, "originated in the manufacturing context of the original labor-law cases involving successorship." *Sullivan*, 623 F.3d at 784-85. However, as the Ninth Circuit has observed, "there is nothing in the statute, the regulation, or in their history or purposes to suggest that this factor applies only to some places of employment." *Id.* at 785. Therefore, this factor concerns "the use of the same physical facilities." *Id.*

In its response to Garcia's Motion, UNMH admits that "[t]here is no dispute among the parties that both UNM[H] and YesCare provided medical and mental health services at MDC."

Doc. 61 at 18. Even so, UNMH argues this factor should be given less weight "owing to the necessity of using the same plant given the services at issue in this case." *Id*. When a predecessor business has invested millions of dollars building a "plant", however, it is often the case that the successor business will, of necessity, continue using the same plant. It does not follow from this truth, however, that a successor's act of using the same plant is irrelevant to the successor-in-interest analysis. Whether of necessity or not, a successor's use of a predecessor's plant makes it more likely that the successor is a successor in interest.

Granted, this factor is not dispositive. When a successor uses the plant for a completely different purpose than the predecessor, a successor's use of the same plant is less meaningful to the successor-in-interest analysis. The present case, however, does not present the situation where a predecessor company used the plant for one purpose (say manufacturing cars) and the successor company converted it for a different purpose (say manufacturing playground equipment). Because UNMH used the same "plant" for the same basic purpose as its predecessor, this factor weighs in favor of finding that UNMH is a successor in interest to YesCare.

**3. Continuity of the Workforce**

UNMH does not dispute "that it offered the YesCare medical and mental health staff employment at MDC under UNM[H], nor does it dispute that most of those employees accepted those offers and did work at MDC under UNM[H] for at least some time." Doc. 61 at 19. However, UNMH asserts that, "of the sixty-eight YesCare employees that began work at MDC under UNM[H], twenty-two of them ceased employment with UNM[H] before the end of 2023 (within five months of when UNM[H] commenced providing services at MDC)." *Id.*

Additionally, UNMH argues that it had no practical choice but to offer employment to former YesCare employees, considering its contractual obligations and the nature of services at issue. *Id*.

The Court concludes that this factor weighs in favor of finding that UNMH is a successor in interest to YesCare. As an initial matter, "the focus of [the] inquiry is on the continuity of business operations overall." *Sullivan*, 623 F.3d at 785. Accordingly, the most relevant period in which to assess substantial continuity of the workforce is at the time of transition between YesCare and UNMH. In this case, at the time of the transition, it is undisputed that UNMH had 68 employees at MDC, all of whom were former YesCare employees. Indeed, in February 2023, a few months before the transition, YesCare had roughly 115 employees at MDC—68 of whom later became UNMH employees.

Moreover, the sword UNMH wields in support of its argument that it is not a successor in interest to YesCare is double-edged. UNMH argues that fifteen former YesCare employees left their employment with UNMH by November 2023 (nearly five months after the transition). Doc. 61-4 at 2. However, this means the vast majority of former YesCare employees who worked for UNMH at MDC maintained their employment with UNMH after UNMH took over. Indeed, UNMH's evidence shows that nearly five months after the transition, almost half of its workforce at MDC was comprised of former YesCare employees. Therefore, even if the Court considers a period of several months following the transition, it would still conclude that substantial continuity of the workforce existed.

Next, the Court rejects UNMH's argument that this factor should be given less weight because the circumstances—its contractual obligations and the nature of the services provided—practically forced it to retain a significant number of former YesCare employees. Similar to UNMH's necessity argument above, UNMH's need to retain a significant number of former

YesCare employees does not advance UNMH's position. To the contrary, accepting UNMH's assertion that it needed to maintain the continuity of the workforce so that it could maintain the continuity of operations indicates that UNMH was a successor in interest.

Thus, this factor weighs in favor of finding that UNMH is a successor in interest to YesCare.

**4. Similarity of Jobs and Working Conditions**

Concerning this factor, UNMH "does not dispute that Garcia's job responsibilities under UNMH would have been substantially similar to her responsibilities under YesCare." Doc. 61 at 19-20. However, UNMH contends that it altered the working conditions "in a way that caused much of the discord between [Plaintiff and UNM[H], ultimately leading to Plaintiff's termination." *Id*. at 20. For example, UNMH notes that all of its institutional policies applied to activities at MDC. *Id*. One of those policies was UNMH's classification of Garcia's position as exempt from overtime pay, which caused friction with Garcia. *Id*.

It is undisputed that UNMH applied its institutional policies—particularly healthcare policies—to its activities at MDC. Doc. 61-1 at 6. Additionally, it is undisputed that Garcia's position with UNMH was a salaried position exempt from overtime, whereas she had previously been eligible for overtime in her position with YesCare. Doc. 55-2 at 75, 82. Nevertheless, these facts do not support a finding that UNMH altered the working conditions to such a degree that it should not be deemed a successor in interest to YesCare. As one court has noted, "[c]ompanies universally change such benefits and policies of an acquired business to conform with their own way of doing business." *Vanderhoof*, 988 F.Supp. at 514. Changes in human resources and wage policies are considered "minor variations in the work place." *Id*. at 513. To prevent the successor in interest label from attaching, "there must be a fundamental change in the nature of the

business enterprise, more than a 'mere restructuring of the hours or conditions of employment.'" *Id*. at 513-14 (quoting *Sys. Mgmt., Inc. v. N.L.R.B.*, 901 F.2d 297, 304 (3rd Cir. 1990)). In other words, the changes in working conditions must be substantial.

UNMH has not come forward with any evidence suggesting that the changes in policies it implemented at MDC resulted in a fundamental change in the nature of the business enterprise. Without such evidence and given that UNMH has conceded that Garcia's job with UNMH was virtually the same as it was with YesCare, the Court concludes that this factor favors finding that UNMH is a successor in interest.

**5. Similarity of Supervisory Personnel**

With respect to this factor, UNMH argues that, although "certain line supervisors from YesCare were retained, management of the medical and mental health services at MDC fell to executive leaders of respective departments at UNM." Doc. 61 at 20. Accordingly, UNMH contends this factor should weigh "significantly in favor of [it] given the importance in this case of the relationship between Plaintiff and her new supervisory personnel at UNM[H]." *Id.* at 21.

Garcia has presented undisputed evidence that UNMH retained several frontline managers at MDC who were previously employed by YesCare. For example, UNMH hired Hurt to be the Interim Behavioral Health Director, before he resigned prior to the transition from YesCare to UNMH. Doc. 55-1 at 93. UNMH subsequently placed Mansaram, another former YesCare employee, in that position. *Id.*; Doc. 55-2 at 45. In addition, UNMH retained Denise Jones, the Director of Nursing at MDC. Doc. 55-1 at 75. Jones was also a former YesCare employee. Doc. 55-2 at 45. UNMH also retained Bouyer and Dietch, former YesCare employees who served as the Health Services Administrator and the Director for Advanced Practice Providers, respectively. Docs. 55-1 at 74, 76-77; 55-2 at 53; 61-1 at 2.

UNMH, however, also installed its own supervisory personnel at MDC following the transition. For example, Perez served as the Associate Chief Nursing Officer for Behavioral Health. Doc. 61-1 at 2. Additionally, Lindsey served as an Executive Director and psychologist for UNMH and had supervisory authority over the behavioral health staff at MDC, Doc. 56-2 at 2-3. However, neither the office of Perez or Lindsay was located onsite at MDC. Doc. 61-1 at 3. It is also undisputed that UNMH hired Hotrum-Lopez as an Executive Director at MDC following the departure of Bouyer. Doc. 55-1 at 91. Lastly, McNease served as an Executive Director for UNMH who provided operational oversight at MDC. Doc. 61-1 at 2. Indeed, these new supervisors, along with human resource employees, were central to Garcia's termination and therefore are central to her claim for retaliation.

Thus, the evidence is that UNMH retained numerous YesCare supervisors while also simultaneously introducing its own upper-level supervisors. On balance, because UNMH's upper-level supervision did not primarily consist of former YesCare employees, this factor tilts in favor of UNMH, but only slightly so given the number of lower-level and mid-level supervisors that came over from YesCare.

**6. Similarity in Machinery, Equipment, and Production Methods**

UNMH contends that Garcia's view of the similarity in machinery, equipment, and production materials is too narrow. Doc. 61 at 21. Although conceding that machinery and larger pieces of equipment at MDC generally revert to the ownership of Bernalillo County, UNMH notes that it replaced "much of the equipment at the MDC when it began providing services there because the equipment was obsolete." *Id*. Additionally, UNMH observes that it is responsible for "providing all supplies used at the facility for the provision of medical and mental health care

services, and it is also required to obtain and maintain all necessary machinery and equipment, even if such equipment reverts to the ownership of the County." *Id*.

On the one hand, it is undisputed that UNMH was required to supply some IT equipment—other than laptop and desktop computers—such as "printers or other computing equipment required in the operation of the medical facility at the MDC." *Id*. at 47. On the other hand, it is undisputed that UNMH used most of the same IT equipment that YesCare had previously used at MDC. Doc. 55-1 at 96-97.

Additionally, it is undisputed that UNMH used some of the medical equipment that YesCare had left behind at MDC. *Id*. at 98-100. It is also undisputed that if UNMH replaced equipment at MDC, such equipment would revert to the ownership of Bernalillo County, unless Bernalillo County failed to reimburse UNMH for such equipment, an arrangement that was identical to the one YesCare had with Bernalillo County. *Id.* at 97. Although it is undisputed that UNMH replaced "a lot" of the medical equipment at MDC because it was obsolete, it did so as an upgrade to equipment, not to replace the type of equipment used. *Id.* at 97. That is, the use of upgraded equipment is consistent with new management continuing the same operation as the prior company.

Accordingly, the Court finds this factor weighs in favor of finding UNMH a successor in interest to YesCare.

**7. Similarity of Products or Services**

Regarding the similarity of products or services, UNMH attacks Garcia's contention that "YesCare's practices served as templates for how UNM[H] would provide medical and mental health services at MDC." Doc. 61 at 22. Specifically, UNMH counters that the "relevant documents (particularly the PSA) evidence that the initial plans were a work in progress." *Id.*

It is undisputed that UNMH, through an agreement with the HCA, contracted to provide medical, dental, mental health, and psychiatric services at MDC—the exact same services that YesCare had previously provided at the facility. Doc. 55-1 at 25, 105. UNMH has not presented any evidence demonstrating how the nature of the services it provided differed in any material way from the nature of services YesCare provided. Accordingly, this factor weighs in favor of finding that UNMH is a successor in interest.

**8. The Ability of the Predecessor to Provide Relief**

UNMH contends that whether YesCare had the ability to grant relief (FMLA leave) is irrelevant because the alleged FMLA violation arose after the transition from YesCare to UNMH. Doc. 61 at 22. The Court agrees. As a "former employer cannot grant leave to a person no longer employed by it," *Sullivan*, 623 F.3d at 786, this factor is inapplicable in this case.

**9. Notice**

In addition to the above eight factors set forth in the FMLA regulations, UNMH argues the Court should also consider whether it was fairly put on notice about Garcia's FMLA claims. As UNMH notes, the Tenth Circuit has stated, "absent the most exceptional circumstances, successor liability cannot be equitably imposed on a successor corporation who has no actual or constructive knowledge of the claims against its predecessor." Doc. 61 at 15 (quoting *Equal Emp. Opportunity Comm'n v. Roark-Whitten Hosp. 2, LP*, 28 F.4th 136, 148 (10th Cir. 2022) (quotations omitted)). UNMH argues it did not have notice of Garcia's claims because: (1) when Garcia started with UNMH she had already come off of the FMLA leave she had been on with YesCare; and (2) "[b]ecause Plaintiff had not been approved for intermittent FMLA leave by her prior employer before she began work with UNM[H], this case does not present a situation where Plaintiff had been granted intermittent FMLA that UNM[H] failed to honor." *Id.* at 16.

UNMH's notice argument, however, goes to whether it is liable for an FMLA violation, not whether it is a successor in interest (who can *potentially* be subject to liability under the FMLA). That is, in the present Order the Court finds that UNMH is a successor in interest for the purposes of determining whether Garcia had sufficient time in service to be eligible to apply for FMLA leave. The present Order does not also hold that, as a successor in interest, UNMH was obligated to approve Garcia's FMLA leave requests or that UNMH otherwise violated the FMLA. Considerations of notice bear on the liability question, which is not a subject of the present Order, more than on the present successor-in-interest question.[6]

**10. Balancing of the Equities**

Although the above factors weigh in favor of finding UNMH is a successor in interest to YesCare, the Court must still balance the equities. *See Cobb*, 452 F.3d at 554 (the FMLA regulations are merely "factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy."). UNMH argues that a balancing of the equities favors finding that it is not a successor in interest to YesCare. Doc. 61 at 22-24. With respect to Garcia's interest, UNMH "does not dispute that Plaintiff has an interest in taking necessary time to care for injured or sick relatives." *Id*. at 24. However, it asserts Garcia's interest "is diminished on the facts of this case." *Id*. Additionally, regarding federal policy, UNMH concedes that "there can be no doubt there is a public policy interest in granting leave to long-term employees." *Id*. Despite this concession, UNMH argues that "Congress also stated its intent in the FMLA that employees be employed with their

---

[6] UNMH has filed a separate motion for summary judgment as to its liability. Doc. 56. In deciding that motion, the Court will address UNMH's argument that, because Garcia was not on FMLA leave when she began her employment with UNMH, UNMH could not have interfered with such non-existent leave or retaliated against Garcia for taking such non-existent leave.

employers for 12 months before becoming eligible for leave." *Id.* Accordingly, UNMH posits that "both a finding of successorship and a finding of no successorship advance" federal policy with respect to the FMLA. *Id*. The Court, however, concludes that the balancing of the equities favors imposing successor liability.

To begin, "[a] stated purpose of the FMLA is 'to entitle employees to take reasonable leave for medical reasons.'" *Cobb*, 452 F.3d at 556 (quoting 29 U.S.C. § 2601(b)(2)). As the Sixth Circuit has noted, the FMLA's "entitlement to reasonable medical leave was intended to apply to all regular full-time employees." *Id*. at 556-57. Here, it is undisputed that Garcia has worked as a mental health professional at MDC since June 2021 for several different correctional medicine providers. Doc. 55-2 at 65, 69-70. Moreover, despite the transition between providers at MDC, Garcia has provided evidence that her role did not materially change. *Id.* at 73-74, 82. Consequently, it is as if "[o]nly the management, not the job, has changed." *Cobb*, 452 F.3d at 557. This weighs in favor of finding that UNMH is a successor in interest.

Additionally, as the Sixth Circuit has observed, "declining to apply successor liability to companies competing for government contracts circumvents implementation of the FMLA." *Id*. It is undisputed that Bernalillo County, prior to the creation of the HCA, previously accepted bids from private, for-profit correctional medicine providers to provide medical care and mental health services at MDC. Doc. 55-1 at 5. Although Bernalillo County and UNMH created the current arrangement at MDC because they both believed it would lead to better care for the inmate population, *see id.* at 5-6, the record contains no evidence about how long this relationship will last. Indeed, UNMH previous experience providing medical care and mental health services to inmates at MDC until the mid-2000s was finite. *Id*. at 5.

If a new entity competing for a government contract is not required to grant holdover employees FMLA leave, regardless of the length of their continuous employment, the new entity "will have lower FMLA costs and correspondingly be at an advantage in the bidding process." *Cobb*, 452 F.3d at 557. If this were allowed to happen with impunity, a new entity could be awarded the contract every time, thereby preventing holdover employees from ever qualifying for FMLA leave. *See id*. This also favors finding that UNMH is a successor in interest.

Finally, "the duty to provide FMLA leave does not arise out of the predecessor company's . . . actions but has an independent source in the FMLA and the employees' decision to maintain continuous employment." *Id.* Accordingly, the duty should survive a change in management where the essential business operation is not substantially changed. *See id*. Despite a change in management, the essential operation of providing medical care and mental health services at MDC did not substantially change.

In sum, the balancing of the equities supports the conclusion that UNMH is a successor in interest to YesCare for purposes of FMLA liability.

**CONCLUSION**

For these reasons, the Court GRANTS Plaintiff Garcia's Partial Motion for Summary Judgment on Successor in Interest Liability under the Family and Medical Leave Act (Doc. 55) and finds that UNMH was a successor in interest to YesCare for the purpose of FMLA liability.

IT IS SO ORDERED.

Steve Yarbrough

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent